20-1081-cv
SEC v. Fowler

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2020

(Argued: June 3, 2021        Decided: July 22, 2021)

Docket No. 20-1081-cv

_____

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

DONALD J. FOWLER,

*Defendant-Appellant.*[*]

_____

Before:

LOHIER and NARDINI, *Circuit Judges*, and CRONAN, *Judge*.[**]

In this enforcement lawsuit filed by the Securities and Exchange Commission (SEC), Donald Fowler appeals from a judgment of the United States District Court for the Southern District of New York (Woods, J.) entered after a jury found that he recommended an unsuitable trading strategy and made unauthorized trades in customer accounts. The District Court ordered

---

[*] The Clerk of Court is directed to amend the caption of this case as set forth above.

[**] Judge John P. Cronan, of the United States District Court for the Southern District of New York, sitting by designation.

disgorgement and the payment of civil penalties, among other sanctions.  On appeal, Fowler argues that the applicable statute of limitations, 28 U.S.C. § 2462, is jurisdictional and cannot be tolled by agreement, that the SEC's suitability claim was improper, and that customer testimony was required to prove all of the SEC's claims of unauthorized trading.  Fowler also claims that the civil penalties imposed against him are excessive.  For the reasons that follow, and because both parties agree that a modest change in the disgorgement award is warranted, the District Court's judgment is **AFFIRMED** as **MODIFIED** herein.

JOHN DELLAPORTAS, Beth Claire Khinchuck, Emmet, Marvin & Martin, LLP, New York, NY, *for Defendant-Appellant Donald J. Fowler*

RACHEL M. MCKENZIE, Senior Counsel, Dominick V. Freda, Assistant General Counsel, Michael A. Conley, Solicitor, Robert B. Stebbins, General Counsel, Securities and Exchange Commission, Washington, DC, *for Plaintiff-Appellee Securities and Exchange Commission*

LOHIER, *Circuit Judge*:

The principal questions presented on appeal are (1) whether 28 U.S.C. § 2462, which imposes a five-year statute of limitations on Securities and Exchange Commission (SEC) enforcement actions for civil penalties, is jurisdictional and not subject to tolling by the parties; (2) whether excessive trading in customer accounts constitutes a violation of customer suitability

requirements as well as churning;[1] and (3) whether civil penalties were properly imposed based on the number of defrauded customers in this case.  We hold that the five-year statute of limitations in § 2462 is not jurisdictional and may be tolled by the parties.  We also conclude that the SEC's suitability claim and the civil penalties imposed in this case were proper and that the other challenges on appeal are without merit.  After modifying the judgment to correct one error in the amount of disgorgement, we affirm.

## BACKGROUND

### I

Donald Fowler, a financial broker, challenges a February 28, 2020 judgment of the United States District Court for the Southern District of New York (Woods, J.) entered after a jury trial.  The jury found that Fowler lied to his investors, recommended a high frequency trading strategy that was not suitable for any customer, and made a series of unauthorized trades in customer

---

[1] "Churning occurs when an account has been excessively traded to generate commissions in contravention to the investor's expressed investment goals."  Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 324 (2d Cir. 2002) (quotation marks omitted).  In comparison, "a suitability claim, generally, is a claim that a broker knew or reasonably believed that the securities he recommended to the customer were unsuitable in light of the customer's investment objectives but that he recommended them anyway."  In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 121 n.3 (2d Cir. 2011) (quotation marks omitted).

accounts, in violation of Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 promulgated under Section 10(b) of the Exchange Act, and Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933. After trial, the District Court ordered Fowler to disgorge $132,076.40, with prejudgment interest, and to pay civil penalties in the amount of $1,950,000 based largely on the number of defrauded customers who were the focus at trial. It also permanently enjoined Fowler from further violations of the securities laws.

## II

Fowler was a registered representative (a broker) for J.D. Nicholas & Associates, Inc. from January 2007 to November 2014. By 2011 Fowler and another J.D. Nicholas broker, Gregory Dean, began pursuing an "event-driven" investment strategy on behalf of several J.D. Nicholas customers.[2] The event-driven strategy was uncomplicated. Fowler reviewed the financial news and found "events" that he believed the stock price of particular companies had yet to fully absorb. He then traded based on his assessment of whether those events would lower or increase the price of a stock. The frequency of Fowler's trades in

[2] Dean, who was alleged to have engaged in essentially the same misconduct with Fowler, settled the SEC's claims against him and is not the subject of this appeal. In this opinion we focus entirely on Fowler.

customer accounts and the average turnover rate of customer accounts—that is, the number of times that assets in the account were replaced—was very high. While J.D. Nicholas considered a turnover rate of just four times per year to be high for an account with conservative objectives, Fowler's customer accounts examined at trial experienced a turnover rate of 116 times per year.

Fowler's excessive trading in these accounts came with significant costs. Customers were charged $65 (later $49.95) per trade. Fowler, meanwhile, had the discretion to charge an extra 3.5 percent fee on any purchase or sale. Fowler received portions of both of those fees as compensation. To make matters worse, Fowler also recommended margin trading to several of his customers, permitting him to borrow money (for which his customers were on the hook) to buy even more stock and thereby increase his commissions.

These various costs devoured any potential gains that Fowler's customers might have hoped to make and only compounded their losses. Indeed, the average account for Fowler's customers needed to generate a 142.6 percent rate of return to cover the costs charged and to break even.[3] To give an idea of how

---

[3] In the securities industry the 142.6 percent figure is referred to as the average cost-to-equity ratio for these accounts, which is the total cost divided by the average equity annualized for the period of time the account was open.

astonishingly high that rate was, J.D. Nicholas warned its brokers that a cost-to-equity ratio of "greater than 10% is often considered high for many clients, because a 10% return is needed for the client to break even." App'x 398. And for more than half the trades that are at issue in this appeal, Fowler also failed to get his customers' approval before making them.

Thirteen customers were the focus of Fowler's trial. Combined, they lost $467,627 as a result of Fowler's trading. Customers, including those who were not the focus of trial, eventually complained about Fowler to the Financial Industry Regulatory Authority (FINRA), a self-regulatory organization that oversees brokers. In particular, they pointed to violations of FINRA's customer suitability requirements and to Fowler's unauthorized trading in their accounts. These complaints prompted J.D. Nicholas to put Fowler on special supervision in 2012, but he nevertheless continued to use the same investment strategy that had landed him in trouble with his customers.

The SEC's investigation of Fowler's trading activity began in 2014. In 2016 the SEC and Fowler executed two agreements that tolled the five-year statute of limitations for the SEC to file an action against Fowler for one year, from March 1, 2016 to February 28, 2017. It is not clear why the parties entered into the

tolling agreement when they did, although the District Court surmised that the SEC needed more time to investigate what it discovered were "unsuitable investment strategies implemented by . . . Dean and Fowler in their customers' accounts." Sp. App'x 68. In any event, the SEC filed this action on January 9, 2017, well before the tolling agreement was set to lapse. By the time the complaint was filed, J.D. Nicholas had gone out of business.

The SEC's amended complaint alleged that Fowler knowingly recommended to customers a "high-cost, in-and-out trading strategy without having a reasonable basis for believing that this strategy was suitable for anyone." App'x 24. The amended complaint also alleged that Fowler "knew or recklessly disregarded that the strategy . . . was bound to lose money," App'x 17, but made "little or no mention of fees and costs" that he knew would erase any gains, App'x 21. Finally, it alleged that Fowler made trades without customer authorization and engaged in churning with respect to at least three customer accounts. In all, the allegations targeted a series of trades implemented by Fowler (and Dean) in twenty-seven accounts at J.D. Nicholas. For reasons not apparent in the record, the SEC eventually dropped the churning cause of action

7

and proceeded with six causes of action under Section 10(b) of the Exchange Act, Rule 10b-5, and Sections 17(a)(1), (2), and (3) of the Securities Act.

III

Before trial, the District Court resolved the parties' motions in limine. Fowler wanted to adduce evidence of customer sophistication to counter what he described as the SEC's "quantitative suitability [i.e. churning] claim masked as a reasonable basis suitability claim."[4] Sp. App'x 28. "[T]he evidence of customer sophistication," he contended, "[was] highly relevant to the issue of [his] control [of the customer's account]," which the SEC would need to demonstrate in order to state a churning claim. Id.

The District Court decided that the SEC could properly bring a suitability claim arising from Fowler's excessive trading in customer accounts and that the sophistication of his customers was irrelevant. The customers' background or diligence, the court said, did not justify the brokers' affirmative misrepresentations or failure to disclose adverse financial information. See Hanly v. SEC, 415 F.2d 589, 595 (2d Cir. 1969).

---

[4] "The reasonable-basis obligation requires a [broker-dealer] to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors." FINRA Rule 2111.05(a).

As noted, Dean settled with the SEC on the eve of trial and Fowler proceeded to trial alone. The SEC's case in chief focused on thirteen of Fowler's customers. The jury heard testimony from four of those customers, as well as from an expert and from Fowler himself. The SEC also introduced a summary chart based on Fowler's phone records to show that Fowler made the majority of trades in the customer accounts without notifying the clients in advance.

The jury rendered a verdict against Fowler on all six causes of action, finding that Fowler had run afoul of the relevant securities laws by recommending an unsuitable investment strategy, making unauthorized trades, and making false and misleading statements to his clients. After the jury's verdict, the District Court ordered Fowler to disgorge $132,076.40 and pay a civil penalty in the amount of $1,950,000. It also permanently enjoined him from future violations of the securities laws.

**DISCUSSION**

I

On appeal, Fowler makes a number of arguments, the most serious of which is that the relevant five-year statute of limitations for SEC enforcement

9

actions, 28 U.S.C. § 2462, is jurisdictional and could not be tolled by agreement between the parties. We address that argument first.

The SEC alleged that Fowler's fraudulent scheme began in 2011, meaning that the statute of limitations would ordinarily have expired in 2016. To buy more time, the SEC and Fowler entered into two agreements that together tolled the statute of limitations for a year, from March 1, 2016 through February 28, 2017. The SEC ultimately sued on January 9, 2017, well within the tolled statute of limitations period.[5]

Fowler maintains that the statute of limitations is jurisdictional and not subject to tolling, so that the limitations period clearly lapsed by 2016 and the SEC could not have sued him thereafter for any of the misconduct alleged in this case. His position runs headlong into the Supreme Court's decision in Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428 (2011). There the Court held that "[f]iling deadlines . . . are quintessential claim-processing rules" that "should not be described as jurisdictional" absent a "clear indication that

---

[5] A recent amendment to the Exchange Act took the SEC's claims for disgorgement and injunctive relief outside of the ambit of § 2462 and retroactively imposed a new, ten-year statute of limitations for those claims. See 15 U.S.C. § 78u(d)(8)(A)(ii), (B). None of the claims in this case accrued more than ten years before they were brought. The SEC's claim for civil penalties against Fowler remains subject to § 2462's five-year statute of limitations.

Congress wanted the rule to be jurisdictional." Id. at 435–36 (quotation marks omitted). The "bright line rule for deciding such questions" therefore turns on clear congressional intent. Id. at 435 (quotation marks omitted). In other words, Fowler "must clear a high bar to establish" that the statute of limitations "is jurisdictional." United States v. Kwai Fun Wong, 575 U.S. 402, 409 (2015). "[T]raditional tools of statutory construction must plainly show that Congress imbued a procedural bar with jurisdictional consequences." Id. at 410. Without "a clear statement, . . . courts should treat [statutes of limitations] as nonjurisdictional." Id. at 409 (quotation marks omitted).

28 U.S.C. § 2462 provides, in relevant part, that "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." Focusing on the phrase "shall not be entertained," Fowler says that the plain text of the statute supports his argument that it is jurisdictional. See SEC v. Graham, 21 F. Supp. 3d 1300, 1308 (S.D. Fla. 2014) (holding that the phrase "shall not be entertained" in this context "amounts to an unequivocal statutory command to federal courts not to entertain an untimely claim"

11

(quotation marks omitted), aff'd in part on other grounds, rev'd in part on other grounds, 823 F.3d 1357 (11th. Cir. 2016). As Fowler suggests, the Supreme Court has described subject matter jurisdiction as "the classes of cases a court may entertain." Fort Bend Cnty. v. Davis, 139 S. Ct. 1843, 1848 (2019). But the Court has also explained that most statutes of limitations are nonjurisdictional "even when the time limit is important (most are) and even when it is framed in mandatory terms (again, most are); indeed, that is so however emphatic[ally] expressed those terms may be." Wong, 575 U.S. at 410 (emphasis added) (quotation marks omitted). For that reason, the phrase "shall not be entertained," on which Fowler so heavily relies, does not itself tell us that Congress intended § 2462 to be jurisdictional.

The statutory history of § 2462 signals that Congress did not intend to impose a jurisdictional requirement where it did not previously exist. In 1948 Congress changed the statutory language from "[n]o suit or prosecution . . . shall be maintained" if not brought within a five-year period to the current language, which (again) provides that "an [enforcement] action . . . shall not be entertained" if not brought within a five-year period. Compare 28 U.S.C. § 791 (1946) (emphasis added), with Pub. L. No. 80-773, § 2462, 62 Stat. 869, 974 (1948)

12

(emphasis added). Recognizing that the predecessor statute was not itself jurisdictional, Fowler submits that the amendment was designed to give the statute jurisdictional teeth. But the amendment does no such thing. First of all, the amendment is "presume[d]" not to "work[] a change in the underlying substantive law unless an intent to make such a change is clearly expressed." John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 136 (2008) (quotation marks omitted). Replacing the term "maintained" with "entertained" in 1948 does not clearly express an intent to convert § 2462 into a jurisdictional statute. And the Reviser's Notes to § 2462 contained in the House Committee report confirm that the "[c]hanges were made in phraseology" only. H.R. Rep. 80-308, at A191 (1947). We see no indication that Congress intended to engineer a substantive legal change in the statute. See Wong, 575 U.S. at 410; see also 3M Co. (Minn. Mining & Mfg.) v. Browner, 17 F.3d 1453, 1458 (D.C. Cir. 1994) (rejecting a reading of § 2462 that would "treat the Reviser's rewriting of § 2462 as a modification of the statute's substance" and concluding that "[w]hen the Reviser's Notes describe the alterations as changes in phraseology, the well-established canon of construction is that the revised statute means only what it meant before 1948").

13

Even if we were to set aside statutory text and history, however, this case is not "the exceptional one in which a century's worth of precedent and practice in American courts rank a time limit as jurisdictional." Sebelius v. Auburn Reg'l Med. Ctr., 568 U.S. 145, 155 (2013) (quotation marks omitted). Until now, we have not squarely addressed the issue in a precedential opinion, although some of our sister circuits have treated § 2462 as a nonjurisdictional statute without specifically holding that it is. See, e.g., Arch Min. Corp. v. Babbitt, 104 F.3d 660, 670 (4th Cir. 1997) (noting that the district court had jurisdiction to consider a § 2462 statute of limitations defense as an affirmative defense); FEC v. Williams, 104 F.3d 237, 240 (9th Cir. 1996) (noting that § 2462 "is subject to equitable tolling"). We see no reason to diverge from the consistent view of our sister circuits. "Neither the text nor the context nor the legislative history indicates (much less does so plainly) that Congress meant to enact something other than a standard time bar" or to engineer a substantive legal change in the statute. Wong, 575 U.S. at 410. We therefore hold that § 2462 is a nonjurisdictional statute of limitations, that the parties' tolling agreement was enforceable, and that the District Court had the authority to hear this case.

14

II

Next, Fowler argues that the SEC improperly brought and pursued a suitability claim rather than a churning claim arising from his excessive trading in his customers' accounts. As we previously noted, the SEC claimed that Fowler had violated his reasonable-basis suitability obligation under FINRA's rules. Fowler's conduct contravened this suitability obligation, the SEC alleged, because he "knew or recklessly disregarded that the strategy [he] knowingly recommended—a high-cost strategy of excessive in-and-out trading—was bound to lose money and was not suitable for [his] customers." App'x 17.

Fowler insists that the SEC's suit should have been limited to a churning claim rather than a reasonable-basis suitability claim. Of course, this argument assumes that churning claims and suitability claims arise from mutually exclusive events. They do not. The various securities law provisions do not cover "different, mutually exclusive, spheres of conduct. . . . [The Supreme] Court and the [SEC] have long recognized considerable overlap among the subsections of . . . Rule [10b-5] and related provisions of the securities laws." Lorenzo v. SEC, 139 S. Ct. 1094, 1102 (2019). So brokers may, in the same course of conduct, make unsuitable trading recommendations to their customers while

at the same time actively churning customer accounts just to generate fees and commissions. In other words, churning claims and suitability claims can arise from the same general set of facts.

The SEC had an adequate basis to pursue its suitability claim under the circumstances of this case. The agency itself has long held that "excessive trading . . . can violate [FINRA] suitability standards by representing an unsuitable frequency of trading." Pinchas, Exchange Act Release No. 41816, 1999 WL 680044, at *6 (Sept. 1, 1999). And even if pursuing a suitability claim on the facts of this case represented a novel approach, novelty is not error. Indeed, Fowler has never suggested that the SEC failed to state a reasonable-basis suitability claim; instead, he has merely asserted that a churning claim was more appropriate.

For these reasons, we find no error in the District Court's decision to allow the SEC to proceed to trial with its reasonable-basis suitability claim.

In his final challenge to the jury verdict, Fowler suggests that the SEC failed to prove that he controlled the customer accounts. There is no doubt that a churning claim requires a plaintiff to prove that the defendant exercised actual or de facto control over the churned accounts. See Newburger, Loeb & Co. v.

*Gross*, 563 F.2d 1057, 1069–70 (2d Cir. 1977).  Even the SEC, which has the burden of proof on this issue, appears to agree.  See *Calabro*, Exchange Act Release No. 9798, 2015 WL 3439152, at *1 (May 29, 2015).  But what is before us is a suitability claim, not a churning claim.  And a suitability claim is different: it fundamentally rests on the broker's recommendation to a potential or actual customer rather than on any actual trading activity.  The SEC was therefore not required to show that Fowler controlled any account in order to prove its suitability claim.  See *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993).  The District Court's ruling to that effect was correct.

## III

Fowler challenges the verdict against him for unauthorized trading because not every victim of his scheme testified at trial to his lack of authorization.  Only some of his customers testified that they had not authorized certain trades Fowler made on their behalf.  In addition to customer testimony, however, the SEC relied on records of phone calls between Fowler and the thirteen customers who were the focus of the trial.  Those records were summarized in a chart.  Fowler had earlier stipulated that he communicated with his customers exclusively by phone, and there was no genuine dispute that the

17

chart accurately reflected Fowler's phone records. The chart was admitted pursuant to Federal Rule of Evidence 1006 over Fowler's objection, but Fowler does not contest its admission on appeal. It showed that Fowler had failed to communicate with his customers before making a majority of the trades in their accounts. The jury ultimately found that Fowler had made unauthorized trades in twelve of the thirteen accounts. On appeal, Fowler contends that the SEC was required to elicit testimony from each customer regarding their accounts and any unauthorized trades at issue.[6] We conclude that the SEC was not required to elicit testimony from every affected customer in order to prove its suitability claim.

As an initial matter, the summary chart itself, which was admitted under Rule 1006 and as such constituted substantive evidence, powerfully demonstrated the extent of Fowler's unauthorized trading by showing how seldom Fowler called his customers before executing trades in their accounts. It signaled how often Fowler traded in the accounts without first checking with his

---

[6] Although the SEC argues that Fowler failed to preserve this issue, it was preserved through his motion in limine objecting to the admissibility of the analysis of his phone records on the ground that the records could not establish, without customer testimony, that certain trades were unauthorized. See United States v. Yu-Leung, 51 F.3d 1116, 1121 (2d Cir. 1995).

clients and obtaining their approval.[7] Limited customer testimony about the nature and frequency of Fowler's unauthorized trading in certain accounts served only to make it more likely than not that Fowler had engaged in unauthorized trading in all thirteen accounts. Additional customer testimony was not necessary to reaffirm the point.[8]

## IV

After the jury's verdict, the District Court imposed (along with a disgorgement award and a permanent injunction) a penalty of $150,000 for each of the thirteen customers who were the focus at trial, totaling $1,950,000. Fowler complains that these penalties exceed the maximum permitted by the statute and in any event are excessive under the Fifth and Eighth Amendments. The SEC responds that Fowler forfeited these arguments by failing to raise them before the District Court. But "we . . . exercise discretion to address an issue not raised

---

[7] In support of his argument, Fowler points exclusively to E.F. Hutton & Co. v. Penham, 547 F. Supp. 1286 (S.D.N.Y. 1982), which he suggests held that customer testimony is required to show unauthorized trading. The decision held no such thing. Instead, it found that the evidence of unauthorized trades in that case was "self-serving" and therefore unreliable. See id. at 1293–95. These concerns are not present here.

[8] To the extent Fowler also argues for the first time on appeal that additional customer testimony was required because the SEC's chart was insufficient to show that he made unauthorized trades in customer accounts, we decline to consider the argument because Fowler failed to challenge the sufficiency of the evidence on this ground after trial. See Ortiz v. Jordan, 562 U.S. 180, 189 (2011).

19

properly before the district court" where, as here, "the issue is purely legal and there is no need for additional fact-finding." Davis v. Shah, 821 F.3d 231, 246 (2d Cir. 2016) (quotation marks omitted).

                                   A

We first address Fowler's argument that the civil penalties in this case run afoul of the penalty sections of the Securities Act, which provide for three tiers of civil penalties. See 15 U.S.C. § 77t(d)(2). The most serious of these, a Tier III civil penalty, sets a maximum penalty "for each . . . violation" that involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." Id. at § 77t(d)(2)(C). In those cases, the maximum penalty is "$100,000 for a natural person" or "the gross amount of pecuniary gain to such defendant as a result of the violation," (what we refer to as the gain clause). Id. The SEC adjusts the $100,000 maximum penalty for inflation based on the date of the violations. See 17 C.F.R. § 201.1001. In Fowler's case, the penalty was adjusted to $150,000. See id. at § 201.1001 tbl.I.

The term "violation" is not defined by the statutory scheme. In the course of determining the appropriate unit of violation, the District Court observed that

20

"Fowler selected his victims for this conduct individually." Sp. App'x 86. As a result, it concluded that "treating his treatment of each of his defrauded customers as a separate violation best effectuates the purposes of the statute." Id. This conclusion is entirely plausible. In SEC v. Pentagon Capital Management PLC, for example, we determined that it was not error to "calculat[e] the maximum penalty by counting each [violative] trade as a separate violation," let alone each customer victimized by the trades. 725 F.3d 279, 288 n.7 (2d Cir. 2013). Fowler argues that Pentagon Capital is inapposite because the total penalty awarded there fell within the alternative statutory maximum in the gain clause. See 15 U.S.C. § 77t(d)(2)(C). Here, by contrast, the District Court imposed iterative civil penalties of $100,000 (adjusted for inflation) per customer under § 77t(d)(2)(C).

The difference between the two statutory caps in § 77t(d)(2)(C) is irrelevant to this appeal. The question before us is whether each defrauded customer can be counted as a separate "violation" under the statute. In Pentagon Capital, we actually emphasized the statute's use of the phrase "each such violation" to conclude that each of the trades in that case was an appropriate unit of violation. See 725 F.3d at 288 n.7.

With this in mind, we note that "[o]nce the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, . . . and its choice of remedies is reviewable for abuse of discretion." SEC v. Sourlis, 851 F.3d 139, 146 (2d Cir. 2016) (quotation marks omitted). Here, the District Court adequately explained that a per-trade penalty "would be so substantial" that Fowler would not "reasonably be capable" of paying it. Sp. App'x 87.[9] And in opposing the SEC's post-trial motion for remedies below, Fowler acknowledged that the jury's findings of liability were customer-specific rather than based on specific trades, even as he insisted that he was merely "carrying out a single scheme." App'x 168–69 (quotation marks omitted). For these reasons, we will not second-guess the District Court's discretionary decision to resort to a per-customer unit of violation to determine the civil penalty in this case.

Adopting a slightly different tack, Fowler points to the SEC's allegations that he engaged in a single fraudulent scheme rather than multiple schemes. He

---

[9] Fowler's ancillary argument that the civil penalty must be tied to the disgorgement amount is wrong. See SEC v. Razmilovic, 738 F.3d 14, 38 (2d Cir. 2013) ("Beyond setting maximum penalties, the statutes leave the actual amount of the penalty up to the discretion of the district court." (quotation marks omitted)).

protests that he likewise should have been penalized for a single violation rather than multiple violations. We reject the idea that the penalty imposed by a district court must track the SEC's litigation approach. And in this case, the District Court did not "believe that penalties should be assessed as if this was a single scheme" because Fowler "selected his victims for this conduct individually" and "each set of trades within a given defrauded customer's account could be considered to be part of a single scheme to defraud that individual." Sp. App'x 86–87. Indeed, Fowler has acknowledged that the number of violations at issue should be determined "based on the Verdict," Appellant's Br. 32, and the jury found Fowler liable on a customer-basis. And Fowler has not disputed that the course of conduct in which he engaged involved multiple violations of the securities laws. Moreover, his argument before the District Court was only that "a single-violation penalty . . . is more appropriate," thus leaving discretionary room for the District Court's conclusion that a multiple-violation penalty was also appropriate. App'x 169–71.

Finally, Fowler urges us to focus on a district court's authority to impose a third-tier penalty "for each . . . violation" only if the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial

losses to other persons," 15 U.S.C. § 77t(d)(2)(C)(II) (emphasis added).  The "clear implication" of the use of the plural "persons," he claims, "is that when multiple investors are affected, the appropriate remedy is to upgrade the penalty from Second to Third Tier, not multiply it for each affected investor."  Appellant's Br. 34.

Fowler's reading would foreclose a Tier III penalty whenever there is a single victim regardless of the type or level of harm.  The interpretation also contradicts the basic principle that "unless the context indicates otherwise . . . words importing the plural include the singular."  1 U.S.C. § 1.  Recall that the maximum penalties in the Tier III provision describe the offender as either a "natural person" or "any other person."  15 U.S.C. § 77t(d)(2)(C).  In order to distinguish from the offender, the statute refers to "other persons" to indicate that Tier III penalties do not include losses the offender suffered.  When viewed in the context of the entire statute, therefore, the term "other persons" means "anyone other than the offender," not "multiple victims."

Fowler also asks us to consider that the monetary penalty that the SEC can impose in SEC administrative proceedings under the Investment Company Act, 15 U.S.C. § 80a-9(d)(2)(C) is based on each "act or omission," not each victim.

24

But this compares statutory apples to statutory oranges. Unlike the statute at issue here, the Investment Company Act provision on which Fowler relies permits the SEC to impose administrative penalties on aiders and abettors. See 15 U.S.C. § 80a-9(d)(1)(A)(ii). The term "act or omission" in that context only makes clear that the SEC can impose penalties specifically for each act of aiding or abetting.

In sum, we are not persuaded that the District Court was barred from treating each defrauded customer as a separate unit of violation in imposing civil penalties. We see no need to set a maximum number of violations that would be appropriate on these facts. We conclude only that the District Court did not abuse its wide discretion in finding at least thirteen violations here.

B

Fowler's constitutional argument fares no better than his statutory challenge. Analogizing to punitive damages, he submits that his civil penalty is so grossly disproportionate to the amount he was ordered to disgorge (fifteen times) that it violated his rights under the Fifth and Eighth Amendments. See, e.g., Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23–24 (1991) (noting that a

punitive damage award more than quadruple the compensatory damage award was "close to the [constitutional] line").

We have not previously held that the civil penalty for a securities fraud offense needs to be proportional to the disgorgement amount. Instead, several factors determine an appropriate civil penalty award: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." SEC v. Rajaratnam, 918 F.3d 36, 44 (2d Cir. 2019).

Fowler has never said that he is unable to pay the civil penalty. The District Court nevertheless considered various factors to decide whether the penalty was proportionate to the gravity of his offense. The District Court found that a significant penalty was warranted against Fowler because "[h]is conduct was egregious." Sp. App'x 85. It especially noted that Fowler "took advantage of the relative lack of sophistication of some of his clients to bilk them"; that he "acted with scienter," continuing his misconduct even in the face of multiple

customer complaints about his investment strategy; and that his conduct resulted in "substantial" losses for customers and was "recurrent." Sp. App'x 85–86. Its conclusion that the penalty was thus proportionate to Fowler's conduct was not error, and the civil penalties imposed in this case fell within constitutional bounds.

V

Fowler also asks us to vacate the District Court's disgorgement award and remand to allow it to recalculate the amount of disgorgement in light of Liu v. SEC, 140 S. Ct. 1936 (2020), which held in relevant part that "courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)." 140 S. Ct. at 1950. Consistent with Liu, the District Court deducted the portion of Fowler's commissions that were transferred to J.D. Nicholas and Dean in the ordinary course. But Fowler failed then and fails now to identify any other legitimate business expenses that the District Court should have deducted in light of Liu.

In general, "[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation." SEC v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013) (quotation marks omitted). If the disgorgement amount is generally reasonable, "any risk of uncertainty" about

27

the amount "fall[s] on the wrongdoer whose illegal conduct created that uncertainty." Id. (quotation marks omitted). Fowler failed to identify any additional "legitimate" business expenses that, consistent with Liu, should have been deducted from an otherwise reasonable disgorgement amount. Yet it was his burden to do so. We therefore decline to remand to the District Court on this issue.

Relatedly, the parties agree that the District Court miscalculated the disgorgement award by ordering Fowler to disgorge more postage fees—that is, the $65 and then $49.95 per trade fee, of which Fowler was to receive a portion— than he actually received. The District Court found that Fowler received $27,498 in postage fees, and ordered him to disgorge that amount (along with his commissions) because it thought that Fowler received 50 percent of the postage fees charged to the thirteen customers, when in fact he received only $3,005 in postage fees. We need not remand to correct this agreed error. See SEC v. Palmisano, 135 F.3d 860, 863–64 (2d Cir. 1998). Instead, we modify the disgorgement award to $107,591.40, plus prejudgment interest in the amount of $25,891.17.

28

**CONCLUSION**

For the foregoing reasons, the judgment of the District Court is

**AFFIRMED** and the disgorgement award is **MODIFIED** consistent with this

opinion.