21-1686 (L)
*SEC v. Ahmed*

# United States Court of Appeals
# for the Second Circuit

August Term 2022
Argued: January 18, 2023
Decided: June 28, 2023

Nos. 21-1686, 21-1712

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff-Appellee*,

v.

IFTIKAR A. AHMED, SHALINI AHMED, I.I. 1, A MINOR CHILD, BY AND
THROUGH HIS NEXT FRIENDS IFTIKAR AND SHALINI AHMED, HIS
PARENTS, I.I. 2, A MINOR CHILD, BY AND THROUGH HIS NEXT FRIENDS
IFTIKAR AND SHALINI AHMED, HIS PARENTS, I.I. 3, A MINOR CHILD, BY
AND THROUGH HIS NEXT FRIENDS IFTIKAR AND SHALINI AHMED, HIS
PARENTS, I-CUBED DOMAINS, LLC, SHALINI AHMED 2014 GRANTOR
RETAINED ANNUITY TRUST, DIYA HOLDINGS, LLC, DIYA REAL
HOLDINGS, LLC,
*Defendants-Appellants*,

v.

JED HORWITT,
*Receiver-Appellee*.*

---

* The Clerk of Court is respectfully directed to amend the caption accordingly.

On Appeal from the United States District Court
for the District of Connecticut

_____

Before: WALKER, RAGGI, and PARK, *Circuit Judges*.

Defendant Iftikar Ahmed defrauded his former employer and its investors of some $65 million over the span of a decade. His scheme ended in 2015 when he was indicted on unrelated insider-trading charges and a subsequent internal investigation revealed the full breadth of his wrongdoing. The Securities and Exchange Commission ("SEC") brought this civil enforcement action against Ahmed for various violations of the securities laws.

To secure a potential disgorgement judgment, the SEC joined Ahmed's family and related entities as Relief Defendants, and the district court (Arterton, *J.*) froze Ahmed's and the Relief Defendants' assets. Ahmed is currently a fugitive from justice, apparently residing in India, so the district court excluded him from discovery of the SEC's investigative file. Due to a lack of excess frozen funds, the district court also denied Ahmed access to funds to hire counsel. The district court granted the SEC's motion for summary judgment and awarded disgorgement, supplemental enrichment (including prejudgment interest and actual gains), and civil penalties against Ahmed. The district court also adopted the SEC's theory that Ahmed is the equitable owner of assets held in the name of the Relief Defendants as "nominees."

On appeal, Ahmed and the Relief Defendants challenge the district court's judgment and calculation of disgorgement. The Relief Defendants also move to stay the liquidation of frozen assets by the Receiver-Appellee pending resolution of these consolidated appeals. We affirm the district court's (1) exclusion of Ahmed from discovery and denial of his access to frozen funds to hire counsel; (2) calculation of Ahmed's disgorgement obligation; and (3) retroactive application of the 2021 amendments to the Securities Exchange Act of 1934 to Ahmed's disgorgement obligation. We

2

conclude, however, that the district court (4) failed to assess whether actual gains on the frozen assets were unduly remote from Ahmed's fraud, and (5) should have applied an asset-by-asset approach to determine whether the Relief Defendants are in fact only nominal owners of their frozen assets.

The district court's order is **AFFIRMED** in part and **VACATED AND REMANDED** in part. In a separate order, we dismiss as moot Defendants' appeals from the district court's liquidation orders. The Relief Defendants' motion for a stay is **DENIED** as moot, and all stays are **VACATED**.

---

VINCENT LEVY (Gregory Dubinsky, Andrew C. Indorf, *on the brief*), Holwell Shuster & Goldberg LLP, New York, NY, *for Defendant-Appellant Iftikar A. Ahmed*.

ADAM G. UNIKOWSKY (Zachary C. Schauf, *on the brief*), Jenner & Block LLP, Washington, DC, *for Defendants-Appellants Shalini Ahmed, I.I. 1, a minor child, by and through his next friends Iftikar and Shalini Ahmed, his parents, I.I. 2, a minor child, by and through his next friends Iftikar and Shalini Ahmed, his parents, I.I. 3, a minor child, by and through his next friends Iftikar and Shalini Ahmed, his parents, I-Cubed Domains, LLC, Shalini Ahmed 2014 Grantor Retained Annuity Trust, DIYA Holdings, LLC, DIYA Real Holdings, LLC.*

STEPHEN G. YODER, Senior Litigation Counsel, *for* Dan M. Berkovitz, General Counsel, and John W. Avery, Deputy Solicitor, Securities and Exchange Commission, Washington, DC, *for Plaintiff-Appellee Securities and Exchange Commission*.

3

John L. Cesaroni, Christopher H. Blau, Stephen M. Kindseth, Zeisler & Zeisler, P.C., Bridgeport, CT, *for Receiver-Appellee Jed Horwitt*.

PARK, *Circuit Judge*:

Defendant Iftikar Ahmed defrauded his former employer and its investors of some $65 million over the span of a decade. His scheme ended in 2015 when he was indicted on unrelated insider-trading charges and a subsequent internal investigation revealed the full breadth of his wrongdoing. The Securities and Exchange Commission ("SEC") brought this civil enforcement action against Ahmed for various violations of the securities laws.

To secure a potential disgorgement judgment, the SEC joined Ahmed's family and related entities as Relief Defendants, and the district court (Arterton, *J.*) froze Ahmed's and the Relief Defendants' assets. Ahmed is currently a fugitive from justice, apparently residing in India, so the district court excluded him from discovery of the SEC's investigative file. Due to a lack of excess frozen funds, the district court also denied Ahmed access to funds to hire counsel. The district court granted the SEC's motion for summary judgment and awarded disgorgement, supplemental enrichment (including prejudgment interest and actual gains), and civil penalties against Ahmed. The district court also adopted the SEC's theory that Ahmed is the equitable owner of assets held in the name of the Relief Defendants as "nominees."

On appeal, Ahmed and the Relief Defendants challenge the district court's judgment and calculation of disgorgement. The Relief Defendants also move to stay the liquidation of frozen assets

4

by the Receiver-Appellee pending resolution of these consolidated appeals. We affirm the district court's (1) exclusion of Ahmed from discovery and denial of his access to frozen funds to hire counsel; (2) calculation of Ahmed's disgorgement obligation; and (3) retroactive application of the 2021 amendments to the Securities Exchange Act of 1934 to Ahmed's disgorgement obligation. We conclude, however, that the district court (4) failed to assess whether actual gains on the frozen assets were unduly remote from Ahmed's fraud, and (5) should have applied an asset-by-asset approach to determine whether the Relief Defendants are in fact only nominal owners of their frozen assets.

## I. BACKGROUND

A. <u>Factual Background</u>

In 2004, Ahmed joined Oak Management Corporation ("Oak"), a venture-capital firm. Ahmed was responsible for identifying and recommending "portfolio companies" in which Oak might invest and negotiating the terms of those investments.

Over the course of a decade, Ahmed stole over $65 million from Oak and ten portfolio companies, identified as Companies A to J in the pleadings, using the same basic scheme in each fraudulent transaction. First, Ahmed opened bank accounts that he personally controlled ostensibly in the name of Oak and its portfolio companies. Second, he used those accounts to divert monies intended for Oak funds and portfolio companies into bank accounts that he and his wife controlled. To cover his tracks, Ahmed submitted fraudulent invoices and contracts to Oak, misrepresenting things like the size of investments, the currency exchange rates applicable to transactions, and the need to make payments to tax authorities or to reimburse

5

legal and other fees. As one example of Ahmed's fraud, in 2013, he negotiated an Oak entity's investment in Company C that was conditioned on Company C redeeming shares of an entity that, unbeknownst to Oak, was owned by Ahmed. Ahmed pocketed more than $8 million from this particular scheme.[1]

In April 2015, Ahmed was arrested on criminal charges in an insider-trading case. *See United States v. Kanodia*, No. 15-cr-10131 (D. Mass. Apr. 21, 2015), ECF 19.[2] Following his arrest, Oak conducted

---

[1] This transaction is described more fully in Section II.B.3.a, *infra*.

[2] Ahmed has been involved in at least four other cases relating to his conduct at Oak. First, Ahmed and a codefendant were indicted for the aforementioned insider trading, which remains pending against Ahmed given his fugitive status. *See United States v. Kanodia*, No. 15-cr-10131 (D. Mass.). The First Circuit affirmed the conviction of Ahmed's codefendant, *see United States v. Kanodia*, 943 F.3d 499 (1st Cir. 2019), as well as the district court's order of a default judgment of forfeiture on Ahmed's appearance bond, *see United States v. Ahmed*, Nos. 21-1193, 21-1194, 2022 WL 18717740, at *1 (1st Cir. Nov. 1, 2022). Second, the SEC and Ahmed settled a civil enforcement action based on the same insider-trading conduct in 2019, and the district court entered a corresponding consent judgment. *See* Final J. as to Def. Iftikar Ahmed & Relief Def. Rakitfi Holdings, LLC, *SEC v. Kanodia*, No. 15-cv-13042 (D. Mass. July 8, 2019), ECF 198. Third, Ahmed was indicted in a separate fraud and criminal money-laundering prosecution, which remains pending. *See* Indictment, *United States v. Ahmed*, No. 16-cr-10154 (D. Mass. June 1, 2016), ECF 34. Fourth, Oak's former client NMR E-Tailing LLC sued Oak and Ahmed. *See* Decision After Trial on Damages at 3, *NMR E-Tailing LLC v. Oak Inv. Partners*, No. 656450/2017 (N.Y. Sup. Ct. June 21, 2021), ECF 406. Oak and NMR settled, but Ahmed proceeded to trial on damages (with liability established by default) *pro se* and as a fugitive, resulting in a judgment against him for $7.5 million in compensatory damages, $500,000 in punitive damages, and prejudgment interest. *See id.* at 1-3, 11. On appeal, the trial court's judgment was

an internal investigation, which revealed that Ahmed had misappropriated approximately $67 million between 2005 and 2015. Oak terminated Ahmed for cause and denied Ahmed "carried interest"—effectively a bonus tied to Oak's performance—based on a provision of its General Partnership Agreement.

B. Procedural Background

1. *Preliminary Injunction*

On May 6, 2015, the SEC filed a civil complaint against Ahmed, alleging violations of the Securities Exchange Act of 1934, the Securities Act of 1933, and the Investment Advisers Act of 1940. The SEC also named the Relief Defendants[3] as the recipients of ill-gotten gains and joint owners of accounts receiving such gains. To secure a potential judgment, the district court granted a temporary restraining order, freezing $55 million in assets. After the SEC moved for a preliminary injunction to continue the TRO, Ahmed fled the United States and remains a fugitive.

After a two-day hearing, the district court granted a preliminary injunction, freezing approximately $65 million for disgorgement, $9.3 million for potential prejudgment interest, and $44 million for potential civil penalties ($118.3 million in total). We affirmed the order. *See SEC v. I-Cubed Domains, LLC*, 664 F. App'x

---

affirmed. *See* Decision and Order, *NMR E-Tailing LLC v. Oak Inv. Partners*, No. 2021-1883 (N.Y. App. Div. 1st Dep't May 25, 2023), ECF 53.

[3] The Relief Defendants are Shalini Ahmed (Ahmed's wife), Ahmed's three minor sons, and several companies held in the Ahmeds' names or for their benefit: Iftikar Ali Ahmed Sole Proprietorship; I-Cubed Domains, LLC; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings, LLC; and DIYA Real Holdings, LLC.

53, 55-56 (2d Cir. 2016).   The district court later denied Ahmed's request for $6 million from frozen funds to hire counsel.   In addition, during discovery, Ahmed requested access to confidential information in the SEC's possession, but the district court denied his request, citing the fugitive-disentitlement doctrine.

2.   *Summary Judgment*

Although Ahmed's fugitive status has remained unchanged, the legal landscape has not.   Before proceeding to summary judgment, the district court held the case pending the Supreme Court's decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017).   *Kokesh* held that "[d]isgorgement in the securities-enforcement context is a 'penalty' within the meaning of [28 U.S.C.] § 2462, and so disgorgement actions must be commenced within five years of the date the claim accrues."   *Id.* at 1639.   *Kokesh* did not address, however, "whether courts possess authority to order disgorgement in SEC enforcement proceedings."   *Id.* at 1642 n.3.   After the decision, the parties proceeded to summary judgment, and Ahmed moved once more to modify the asset freeze.   The district court bifurcated the case into liability and remedy stages, and applying *Kokesh*'s five-year bar, modified the asset freeze to freeze assets up to $89 million.

At the liability stage, the district court entered summary judgment for the SEC.   At the remedies stage, the district court awarded a permanent injunction, $41,920,639 in disgorgement, $21 million in civil penalties, $1,520,953 in prejudgment interest for the period before the asset freeze at the IRS underpayment rate, and "actual returns on the frozen assets" during the pendency of the asset freeze.   Special App'x at SPA-98 to -109.   The district court rejected Ahmed's argument that *Kokesh* barred disgorgement, and it denied an

8

offset for the "carried interest" that Ahmed forfeited to Oak upon his termination for "Disabling Conduct" within the meaning of his contract with Oak.

The district court also adopted the "nominee" theory as to the assets held in the name of the Relief Defendants. Applying a six-factor test, the district court concluded that these frozen assets were equitably owned by Ahmed and that the Relief Defendants had failed to refute the SEC's supporting evidence. Although the district court permitted liquidation of frozen assets to proceed under the supervision of Receiver-Appellee Jed Horwitt (the "Receiver"), it stayed distribution pending appeal. In a ruling issued in conjunction with an amended final judgment, the district court clarified that the judgment did "not extinguish the SEC's remaining alternative theory of liability against the Relief Defendants" under *SEC v. Cavanagh* (*Cavanagh I*), 155 F.3d 129 (2d Cir. 1998). Special App'x at SPA-162.

3.    *Initial Appeal*

After Ahmed filed a notice of appeal, we held the case in abeyance pending the Supreme Court's decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020).[4]    Although the Exchange Act did not explicitly authorize a "disgorgement" remedy, *Liu* held that disgorgement is a form of "equitable relief" authorized under 15 U.S.C. § 78u(d)(5)—answering the question left open by *Kokesh*. *Liu*, 140 S. Ct. at 1940.

---

[4] Ahmed also moved for the release of funds to pay for counsel. A motions panel of this Court construed Ahmed's motion as seeking *mandamus* relief directing the district court to rule on a similar motion then before it and denied Ahmed's motion as moot after the district court denied the motion.

9

Shortly after *Liu*, Congress enacted the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), Pub. L. No. 116-283, § 6501(a)-(b), 134 Stat. 3388, 4625-26 (codified at 15 U.S.C. § 78u(d)(3), (7)-(8)).   The NDAA amended the Exchange Act in three ways relevant here.   First, the NDAA explicitly authorized the SEC to pursue disgorgement in civil actions. *See* NDAA § 6501(a), 134 Stat. at 4625-26 (codified at 15 U.S.C. § 78u(d)(7)).   Second, the NDAA extended the statute of limitations for "a claim for disgorgement" to "not later than 10 years after the latest date of the violation" for conduct under certain securities laws. *Id.* at 4626 (codified at 15 U.S.C. § 78u(d)(8)).   Finally, the NDAA provided that its amendments "shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date of enactment of this Act."   *Id.*

The SEC moved to remand for recalculation of Ahmed's disgorgement obligation under the NDAA.   Ahmed opposed, arguing that (1) this Court lacked jurisdiction to remand because the SEC failed to cross-appeal; (2) application of the NDAA would reopen a final judgment; (3) the NDAA lacks a clear retroactivity command, and retroactive application would violate the Ex Post Facto Clause; and (4) the NDAA does not apply to disgorgement under 15 U.S.C. § 78u(d)(5).   A motions panel granted the SEC's motion and remanded "for a determination of Appellant's disgorgement obligation consistent with § 6501 of the [NDAA], and, if appropriate, entry of an amended judgment."   *SEC v. Ahmed*, Nos. 18-2903, 18-2932, 19-102, 19-103, 19-355, 19-2974, 19-3375, 19-3610, 19-3721, 2021 WL 1171712, at *1 (2d Cir. Mar. 11, 2021).

10

### 4. *Remand and Liquidation*

On remand, the district court found that the NDAA's ten-year statute of limitations applied and increased the disgorgement amount from $41,920,639 to $64,171,646.14, with $9,755,798.34 in prejudgment interest. The district court also rejected the same arguments Ahmed raised before the motions panel. Ahmed and the Relief Defendants appealed again, giving rise to this action.

The district court also approved the Receiver's proposed liquidation plan, which was divided into two phases ("First Liquidation Order"). Phase 1 would liquidate non-unique assets, and phase 2 would liquidate unique assets as needed to satisfy the judgment. The district court denied the Relief Defendants' motion for a stay pending appeal. Defendants then appealed the First Liquidation Order, which this Court held in abeyance pending resolution of the merits of this appeal.

Phase 1 ended with $118 million in the receivership estate, which was insufficient to secure the total judgment, then estimated to be in excess of $125 million. The district court approved most of the Receiver's phase 2 plan and rejected the Relief Defendants' motion to stay liquidation of the unique assets pending appeal ("Second Liquidation Order"). Defendants appealed the Second Liquidation Order, with the Relief Defendants moving to stay liquidation of the unique assets. This Court held the appeals of the Second Liquidation Order in abeyance pending our decision in these appeals from the redetermined amended final judgment. While the Relief Defendants' stay motion was pending, the Receiver indicated that he would begin phase 2 by liquidating a MetLife life-insurance policy on December 28, 2022, and listing the Ahmeds' two Park Avenue

apartments for sale on May 8, 2023. We granted temporary administrative stays pending our decision on the Relief Defendants' motion for a stay of liquidation.

## II. DISCUSSION

Ahmed first argues that summary judgment was improper because he was excluded from discovery and denied access to funds to hire counsel. Ahmed also argues that the district court miscalculated disgorgement by incorrectly approximating net profits and erroneously applying the NDAA. The Relief Defendants raise two additional arguments: first, the district court improperly calculated prejudgment interest and actual gains, and second, it misapplied the "nominee" doctrine. Although we are not persuaded by Ahmed's arguments, we find merit in some of the Relief Defendants' arguments.

A.    Summary-Judgment Challenges

Ahmed challenges the district court's summary-judgment order, arguing that the district court erred by limiting his access to discovery and by denying his request to unfreeze assets to hire counsel. Neither argument is persuasive.

1.    *Discovery Limitations*

The district court did not abuse its discretion by denying Ahmed extraterritorial access to confidential records in the SEC's possession. Drawing on the fugitive-disentitlement doctrine, the district court reasoned that Ahmed had "removed himself from the jurisdiction of the [district court]," so the district court had "no ability to enforce" an "appropriate protective order limiting his use of the documents produced." Endorsement Order Denying Def.'s Mot. for

12

Full Access to the SEC's Investigative File at 3, *SEC v. Ahmed*, No. 15-cv-675 (D. Conn. Aug. 22, 2016), ECF 286.   The district court thus denied Ahmed access to SEC discovery materials.   Ahmed argues that this denied him "any practical means of defending himself" in violation of "the adversarial process set forth in the Federal Rules of [Civil] Procedure" and the Due Process Clause.   Appellant's Br. at 53, 60-61.   We disagree.

Federal Rule of Civil Procedure 26(c)(1) permits a district court to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."   *See Degen v. United States*, 517 U.S. 820, 826 (1996) (explaining that district courts have broad authority "to manage discovery in a civil suit, including the power to enter protective orders limiting discovery as the interests of justice require"); *accord Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997).   We review discovery orders for abuse of discretion.   *See Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 202 (2d Cir. 2013); *United States v. Technodyne LLC*, 753 F.3d 368, 378 (2d Cir. 2014).

The district court's discovery restrictions here were a reasonable exercise of its broad power to enforce protective orders. "Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities." *Degen*, 517 U.S. at 823.   A district court retains "authority to manage discovery," including "limit[ing] discovery in the interests of justice." *Finkelstein*, 111 F.3d at 281; *see also Degen*, 517 U.S. at 827 ("A federal court has at its disposal an array of means to enforce its orders."). The discovery material at issue was subject to a protective order

13

under Rule 26 based on the confidential and sensitive nature of the documents, and the district court determined that the court could not enforce such an order because Ahmed had removed himself from the court's jurisdiction. The district court's limitation of Ahmed's extraterritorial access to the protected materials thus constituted a reasonable exercise of the court's "inherent authority to protect" its own discovery orders to limit Ahmed's access to civil discovery in light of his status as a fugitive. *Degen*, 517 U.S. at 823. Ahmed's proposed alternatives, like monetary sanctions, would not ensure the adequate protection of confidential information in this case.

We affirm the discovery limitations as a reasonable means of enforcing a protective order, so we do not decide whether the fugitive-disentitlement doctrine might apply in this case consistent with due process.[5] *See Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396 n.2 (2d Cir. 2018) ("We are free to affirm on any ground

---

[5] Under the fugitive-disentitlement doctrine, "a person who is a fugitive from justice may not use the resources of the civil legal system while disregarding its lawful orders in a related criminal action." *United States v. Eng*, 951 F.2d 461, 464 (2d Cir. 1991), *abrogated on other grounds by Degen*, 517 U.S. 820. A blunt instrument, the fugitive-disentitlement doctrine "forbid[s] *all* participation by the absent claimant." *Degen*, 517 U.S. at 826 (emphasis added). Although we do not decide whether the doctrine applies here, we note that the purposes underlying it are served by the district court's order. Disentitlement is rooted in a court's ability to enforce a "judgment on review," "discourage[] the felony of escape," "encourage[] voluntary surrenders," and "promote[] the efficient, dignified operation of the courts." *Id.* at 824 (cleaned up). Ahmed faces several criminal charges, *see supra* note 2, and granting him full access to discovery could further discourage his voluntary return to the United States and grant him an unfair advantage in those proceedings to the extent they are based on the same or related underlying conduct.

14

that finds support in the record, even if it was not the ground upon which the trial court relied." (cleaned up)).

### 2. *Denial of Funds to Hire Counsel*

The district court did not abuse its discretion by declining to unfreeze assets for Ahmed to hire counsel. Ahmed argues that the district court "over-froze [his] liquid assets, and thus improperly deprived him of the ability to use *his money* to hire counsel." Appellant's Br. at 61. For the reasons stated *infra*, the district court properly calculated disgorgement, so it did not abuse its discretion by concluding that there were no frozen funds available for Ahmed to hire counsel.[6] It is well-settled that a defendant has no right to use tainted assets for his legal defense. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989) ("A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney."). Moreover, Ahmed has no constitutional right to counsel in this civil enforcement action. *See United States v. Coven*, 662 F.2d 162, 176 (2d Cir. 1981). In any event, the Relief Defendants have hired able counsel who have also represented Ahmed's interests throughout these proceedings.

---

[6] Our decision to vacate and remand the district court's award of "actual gains" has no bearing on the denial of Ahmed's motion to unfreeze funds for two reasons. First, the "actual gains" calculation is part of the post-judgment liquidation process, whereas Ahmed's motion to unfreeze funds relates to the scope of the preliminary injunction. Second, "actual gains" are calculated based on the growth of disgorged assets regardless of the size of the judgment. So "actual gains" and disgorgement are independent for present purposes.

B.    Disgorgement

The district court did not abuse its discretion in calculating disgorgement.    First, the district court accurately estimated net profits and reasonably declined to offset Ahmed's forfeited "carried interest."    Second, the district court properly gave retroactive effect to the NDAA.

1.    *Legal Standard*

The Exchange Act, as amended, states that "[i]n any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."    15 U.S.C. § 78u(d)(7).    "Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct."    *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014).    We review disgorgement orders for abuse of discretion.    *SEC v. Warde*, 151 F.3d 42, 49 (2d Cir. 1998).    "We review *de novo* questions of a statute's interpretation and constitutionality." *United States v. al Kassar*, 660 F.3d 108, 129 (2d Cir. 2011).

2.    *Equitable Disgorgement After the NDAA*

As a preliminary matter, the parties assume, and we agree, that *Liu*'s equitable limitations on disgorgement survive the NDAA.    In *Liu*, the Supreme Court held that although the Exchange Act did not (at the time) explicitly authorize "disgorgement," "equitable relief" under § 78u(d)(5) includes disgorgement.    140 S. Ct. at 1940.    The Court thus held that any disgorgement award must be consistent with traditional principles of equity.    *See id.* at 1947.    Shortly after *Liu*, Congress enacted the NDAA, which specifically added "disgorgement" as a remedy under § 78u(d)(7) while leaving

16

untouched "equitable relief" available via § 78u(d)(5). We read "disgorgement" in § 78u(d)(7) to refer to equitable disgorgement as recognized in *Liu*.[7]

First, § 78u(d)(7) authorizes "disgorgement," which we have long understood to refer to "the chancellor's discretion to prevent unjust enrichment" at equity. *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 95 (2d Cir. 1978); *see* 15 U.S.C. § 78u(d)(3)(A)(ii) (explaining that the SEC may seek and courts have jurisdiction to "require disgorgement . . . of any unjust enrichment by the person who received such unjust enrichment" as a result of violating the Exchange Act). This terminology is "consistent with a remedy rooted in equity, given that 'unjust enrichment' is another term of art—the basis for all restitution, which is often equitable." *Hallam*, 42 F.4th at 340. Indeed, as the Supreme Court has observed, "'statutory reference[s]' to a remedy grounded in equity 'must, absent other indication, be deemed to contain the limitations upon its availability that equity typically imposes.'" *Liu*, 140 S. Ct. at 1947 (alteration in original) (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211 n.1 (2002)); *see also Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("Congress is understood to legislate against a background of common-law adjudicatory principles."). The NDAA's text evinces no intent to contradict *Liu* or to strip disgorgement of "limit[s] established by longstanding principles of equity" in favor of an unbounded "legal" form of

---

[7] The Fifth Circuit recently held that § 78u(d)(7) "authorize[s] legal 'disgorgement' apart from the equitable 'disgorgement' permitted by *Liu*" and questioned "whether equitable disgorgement . . . survived the 2021 Exchange Act amendments." *SEC v. Hallam*, 42 F.4th 316, 341, 343 (5th Cir. 2022). We decline to follow the Fifth Circuit's approach.

17

disgorgement. *Liu*, 140 S. Ct. at 1947. We thus apply "the strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *SEC v. Alpine Sec. Corp.*, 982 F.3d 68, 78 (2d Cir. 2020) (brackets omitted) (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018)).

Second, reading "disgorgement" under § 78u(d)(7) as equitable disgorgement is consistent with the statutory history. Before the NDAA, "Congress did not define what falls under the umbrella of 'equitable relief,'" so "courts . . . had to consider which remedies the SEC may impose as part of its § 78u(d)(5) powers." *Liu*, 140 S. Ct. at 1940. This created some uncertainty about whether, for example, the Exchange Act authorized disgorgement and the applicable statute of limitations. *See, e.g.*, *Kokesh*, 581 U.S. at 461-62 & n.3. The NDAA then clarified some aspects of this uncertainty. The express addition of "disgorgement" as a remedy specified under § 78u(d)(7) is thus best read, not as superfluity, but as a "belt and suspenders" clarification that equitable disgorgement is available under the Exchange Act. Moreover, the authorization of a ten-year statute of limitations under § 78u(d)(8)(A)(ii) is best understood as expressly overruling *Kokesh*'s five-year statute of limitations as to certain securities violations. So we conclude that disgorgement under § 78u(d)(7) must comport with traditional equitable limitations as recognized in *Liu*.

3. *Disgorgement Calculation*

The district court properly calculated Ahmed's disgorgement obligation. Ahmed argues that the district court (1) miscalculated "net profits" from two fraudulent transactions involving Company C

18

("C1" and "C2") and (2) failed to account for the "carried interest" forfeited to Oak upon his termination for "Disabling Conduct." He further argues that any reduction in the district court's disgorgement award should also reduce the district court's civil penalty. We conclude that both arguments are meritless, so we decline to disturb the district court's rulings as to either disgorgement or civil penalties.

### a.  Net Profits Calculation

The district court did not abuse its discretion in its calculation of net profits. Disgorgement must "not exceed a wrongdoer's net profits and is awarded for victims," *Liu*, 140 S. Ct. at 1940, "that is, the gain made upon any business or investment, when both the receipts and payments are taken into account," *id.* at 1945 (cleaned up). We have held that the "amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation." *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (cleaned up).

Here, the district court reasonably approximated net profits based on the difference between the sale and purchase prices involved in the tainted Company C transactions. As to C1, Ahmed—in his capacity as a member of BVI Company's board of directors—"personally negotiated" a $2 million investment in Company C without BVI Company's knowledge. When the unapproved investment was uncovered, Ahmed "purposefully lied to his fellow BVI Company directors" that the purchase was a "mistake." Special App'x at SPA-35. Ahmed then bought the shares himself, ostensibly to correct for the "mistake," but left them in the BVI Company's name. Ahmed later negotiated another investment by an Oak entity in Company C that was conditioned on Company C paying nearly $11 million to redeem BVI Company's

19

shares—which, unbeknownst to the Oak entity, were owned by Ahmed. Ahmed profited more than $8 million on the sale.

As to C2, Ahmed had invested in Company C via Relief Defendant I-Cubed Domains, LLC, of which Ahmed was founder and sole member, without disclosure to Oak. Ahmed then pitched Oak on a $7.5 million stock-purchase agreement for I-Cubed's Company C shares without disclosing his personal stake, even going so far as to forge the signature of I-Cubed's former manager on the transaction paperwork to conceal his personal interest. Ahmed's fraud may not have driven Company C's entire growth, but it permitted him to realize profits driven by that growth. So it was a reasonable approximation of net profits to take the difference between "gross sales revenues from the sale of Company C shares" and Ahmed's "initial cost of purchasing the Company C shares." *Id.* at SPA-103; *see Fowler*, 6 F.4th at 267.

Ahmed's arguments to the contrary are unavailing. Ahmed argues that, in calculating net profits, the district court should have credited him an offset based on C1 and C2 because there was no evidence that Oak paid inflated prices as opposed to fair market value. Specifically, as to C1, Ahmed argues that any difference between the purchase and sale prices of Company C stock was based on "an increase in the market price of the shares," not Ahmed's "unlawful activity." Appellant's Br. at 41. As to C2, Ahmed argues that the district court failed to account for the fact that the market value of Company C shares was likely well above the price Oak actually paid.

These arguments fail. Ahmed's misconduct with respect to these transactions was not in misrepresenting the purchase prices but

20

in failing to disclose his conflicts of interest, which violated the Advisers Act. *See* 15 U.S.C. § 80b-6(3). The C1 and C2 transactions were thus entirely tainted, and Ahmed's $14.4 million in profits from the transactions constituted his "net profits from wrongdoing" under *Liu*. *See Contorinis*, 743 F.3d at 301 ("Because disgorgement's underlying purpose is to make lawbreaking unprofitable for the law-breaker, it satisfies its design when the lawbreaker returns the fruits of his misdeeds, regardless of any other ends it may or may not accomplish.").

Moreover, Ahmed bears the risk of uncertainty affecting the size of disgorgement. "A wrongdoer's unlawful action may create illicit benefits for the wrongdoer that are indirect or intangible. . . . [T]o require precise articulation of such rewards in calculating disgorgement amounts would allow the wrongdoer to benefit from such uncertainty." *Id.* at 306; *see also Fowler*, 6 F.4th at 267 ("If the disgorgement amount is generally reasonable, any risk of uncertainty about the amount falls on the wrongdoer whose illegal conduct created that uncertainty." (cleaned up)). The fact that Oak, a victim of Ahmed's fraud, might have gotten a "bargain" on the share purchase should not redound to the fraudster's benefit. We thus find no abuse of discretion in the disgorgement calculation.

### b. Carried-Interest Offset

Ahmed next argues that the district court should have offset the disgorgement award by the "carried interest" he forfeited to Oak because this forfeiture was "on account of the [unlawful] conduct at issue in this case." Appellant's Br. at 50. We disagree.

Ahmed's General Partnership Agreement with Oak stated that "any Member who is removed by reason of having engaged in

21

Disabling Conduct shall forfeit for no consideration such Member's entire membership interest, Percentage Interest and Capital Account and shall not become, or shall cease to be, as applicable, a Class B member." Special App'x at SPA-120. Part of Ahmed's "membership interest" was a "carried interest" bonus based on "the performance of the Oak Funds." *Id.* at SPA-120 n.24. So Ahmed's forfeited "carried interest" is not an ill-gotten gain from his fraud but rather was his *expectancy* to a portion of Oak's profits conferred by the General Partnership Agreement. But disgorgement does not protect the wrongdoer's expectancy interests; it attempts to "restor[e] the status quo" by "tak[ing] money out of the wrongdoer's hands." *Liu*, 140 S. Ct. at 1943 (cleaned up). Equity does not require an offset for the carried interest, which was contingent on Ahmed's relationship with Oak and was not derived directly from his fraud.

Ahmed's argument to the contrary is unpersuasive. He contends that the Court should follow the approach of *SEC v. Penn*, in which a district court ordered an evidentiary hearing to determine "the value of [the defendant's] forfeited interest in the fund" of his former employer to offset his disgorgement obligation. No. 14-cv-581, 2017 WL 5515855, at *3-4 (S.D.N.Y. Aug. 22, 2017). But in that case, the "SEC d[id] not dispute that Penn's carried interest in the Fund . . . could offset his disgorgement obligation," in accordance with the terms of Penn's plea agreement. *Id.* at *4. *Penn* did not conclude that forfeited carried interest generally should offset a disgorgement obligation.[8]

---

[8] Ahmed also requests that the district court on remand offset his disgorgement obligation by the amount of civil judgments obtained against

22

We thus affirm the district court's calculation of Ahmed's disgorgement obligation and decline to revisit its calculation of civil penalties.

### 4. *Application of the NDAA*

The district court did not err by applying the NDAA's expanded statute of limitations to Ahmed's disgorgement obligation. Ahmed argues that the district court's application of the NDAA was incorrect for four reasons: (1) the SEC failed to cross-appeal; (2) the district court reopened a final judgment; (3) the NDAA does not apply retroactively; and (4) application of the NDAA violates the Ex Post Facto Clause. Although the SEC argues that Ahmed's first three arguments are barred by the law-of-the-case doctrine, we do not decide whether that doctrine applies because all four of Ahmed's arguments are without merit.

### a. Cross-Appeal Rule

The SEC's failure to cross-appeal did not prevent the district court from recalculating disgorgement under the NDAA. Under the cross-appeal rule, "an appellate court may not alter a judgment to benefit a nonappealing party." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008). Ahmed argues that the cross-appeal rule is jurisdictional, so the SEC's failure to cross-appeal from the amended final judgment deprived the district court of jurisdiction to enlarge disgorgement under the NDAA. This argument fails.

---

him by his victims. This could be appropriate if Ahmed were to prove that he paid restitution. *See, e.g.*, *SEC v. Palmisano*, 135 F.3d 860, 863-64 (2d Cir. 1998).

First, the cross-appeal rule did not deprive the district court of jurisdiction to recalculate disgorgement. It is well-settled that "the requirement of a cross-appeal is a rule of practice which is not jurisdictional and in appropriate circumstances may be disregarded." *Finkielstain v. Seidel*, 857 F.2d 893, 895 (2d Cir. 1988); *accord Texport Oil Co. v. M/V Amolyntos*, 11 F.3d 361, 366 (2d Cir. 1993) (explaining that "there has been some conflict in our Court as to whether the late filing of a notice of cross-appeal is a matter of practice or is a jurisdictional bar" and "adher[ing]" to *Finkielstain*); *see also Carlson v. Principal Fin. Grp.*, 320 F.3d 301, 309 (2d Cir. 2003) (relying on *Finkielstain* and *Texport* and treating the cross-appeal rule as non-jurisdictional); *Clubside, Inc. v. Valentin*, 468 F.3d 144, 162 (2d Cir. 2006) (same).[9]

Second, the cross-appeal rule is inapplicable to Ahmed's case because the SEC did not seek to "enlarge its rights under the judgment by enlarging the . . . scope of equitable relief," *Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1286 (2d Cir. 1994)—*i.e.*, the outcome that the cross-appeal rule forbids—but rather sought to remand the case to present its NDAA arguments to the district court in the first instance. Critically, the SEC could not have presented these arguments in a timely cross-appeal because the NDAA was enacted *after* the deadline to file a cross-appeal had passed. It would make little sense if the cross-appeal rule prevented nonappealing parties from receiving the benefit of intervening retroactive statutes. As this Court explained in *Litton Systems, Inc. v.*

---

[9] *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014), is not to the contrary. There, we characterized as "jurisdictional" only Federal Rule of Appellate Procedure 3(c)(1)(B)'s requirement that a notice of cross-appeal identify the challenged district-court order. *Id.* at 93.

*American Telephone & Telegraph Co.*, 746 F.2d 168 (2d Cir. 1984), albeit under somewhat different circumstances,

> No party to an appeal should be held to a standard that permits consideration of an intervening statute only when issues affected by the statute are already pending on appeal. Such a standard would require either anticipation of statutes not yet enacted or the assertion of frivolous grounds in appeals and cross-appeals in the hope that a new statute might affect their resolution favorably.

*Id.* at 171. We decline to apply the cross-appeal rule in Ahmed's case because it would frustrate congressional intent and judicial economy.

### b. Reopening a Final Judgment

Nor would application of the NDAA reopen a final judgment. "When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 226 (1995). The Supreme Court has taken care to distinguish "judgments from which all appeals have been forgone or completed" and "judgments that remain on appeal." *Id.* at 227.

Here, the district court's grant of summary judgment is not "final" within the meaning of *Plaut* because appeals are ongoing. *See Miller v. French*, 530 U.S. 327, 347 (2000) ("[W]hen Congress changes the law underlying a judgment awarding . . . relief, that relief is no longer enforceable to the extent it is inconsistent with the new law. Although the remedial injunction . . . is a final judgment for purposes

25

of *appeal*, it is not the last word of the judicial department . . . [because it] is subject to the continuing supervisory jurisdiction of the court, and therefore may be altered according to subsequent changes in the law." (emphasis added) (cleaned up)).   Application of the NDAA thus does not reopen a final judgment.

c.      Retroactivity of the NDAA

The district court also did not err by giving retroactive effect to the NDAA's disgorgement amendments.   In *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), the Supreme Court explained that "[s]ince the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights unless Congress had made clear its intent."   *Id.* at 270.   To overcome this presumption against retroactivity, a "court must ask whether the new provision attaches new legal consequences to events completed before its enactment," thereby suggesting "clear congressional intent authorizing retroactivity."   *Id.* at 269-70, 272.

The NDAA's disgorgement amendments explicitly apply to cases pending at the time of enactment.   Section 6501(b) provides that the NDAA's disgorgement amendments "shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date of enactment of this Act."   Pub. L. No. 116-283, § 6501(b), 134 Stat. 3388, 4626 (2021).   The Supreme Court has, in *dicta*, interpreted nearly identical language as a retroactivity command.   *See, e.g.*, *Landgraf*, 511 U.S. at 255 & n.8, 256 (construing the phrase "shall apply to all proceedings pending on or commenced after the date of enactment of this Act" as an "explicit retroactivity command"); *Martin v. Hadix*, 527 U.S. 343, 354-55 (1999) (same).   If Congress enacts a provision containing a phrase to which the

Supreme Court has previously ascribed a particular meaning, we will presumptively confer that meaning to the provision. *See generally Siebert v. Conservative Party of N.Y. State*, 724 F.2d 334, 337 (2d Cir. 1983) (recounting the "canon of statutory construction that Congress is presumed to be aware of the judicial background against which it legislates"). We thus conclude that the NDAA's disgorgement amendments apply retroactively to Ahmed's case.

We are not persuaded by Ahmed's contrary arguments. First, we reject Ahmed's argument that the SEC may not receive the benefit of the ten-year statute of limitations because the SEC initially brought this enforcement action under 15 U.S.C. § 78u(d)(5), not § 78u(d)(7). Section 78u(d)(7) did not exist at the time the SEC filed suit, so it would have been impossible to invoke that provision. In any event, the SEC brought the action "pursuant to the authority conferred upon it by . . . 15 U.S.C. § 78u(d)" generally, Second Am. Compl. at 4, *SEC v. Ahmed*, No. 15-cv-675 (D. Conn. Apr. 1, 2016), ECF 208, and, as the district court explained, it "relied on the common law injunctive," *i.e.*, equitable, "power of the district court[]," Special App'x at SPA-245. Similarly, the district court itself "did not rely solely on [15 U.S.C. § 78u(d)(5)] to authorize disgorgement in its initial ruling" and instead exercised its inherent equitable power to do so. *Id.*

Second, Ahmed's argument that the NDAA eviscerated his "*vested and adjudicated* limitation defense" is meritless. Appellant's Br. at 33 (emphasis in original). The Supreme Court imposed a five-year statute of limitations on disgorgement in *Kokesh*, 137 S. Ct. 1635, which was decided over two years after the SEC brought this action. So Ahmed could not have had a reliance interest in *Kokesh*'s statute of limitations before the SEC brought this action. We thus interpret the

27

NDAA to contain an effective retroactivity command applicable to Ahmed's case.

### d. Ex Post Facto Clause

Finally, the district court's application of the NDAA to Ahmed's disgorgement award did not violate the Ex Post Facto Clause. Ahmed argues that disgorgement under the NDAA is punitive, so retroactive application to his case would run afoul of the Ex Post Facto Clause's guarantee. We are not persuaded.

The Constitution provides, "No . . . ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. "To violate the Ex Post Facto Clause . . . a law must be retrospective—that is, it must apply to events occurring before its enactment—and it must disadvantage the offender affected by it, by altering the definition of criminal conduct or increasing the punishment for the crime." *Abed v. Armstrong*, 209 F.3d 63, 66 (2d Cir. 2000) (cleaned up). A two-step framework governs Ex Post Facto Clause challenges. At step one, "[w]e must ascertain whether the legislature meant the statute to establish 'civil' proceedings." *Smith v. Doe*, 538 U.S. 84, 92 (2003) (cleaned up). If Congress's intention "was to impose punishment, that ends the inquiry." *Id.* "If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive," we must proceed to step two and "further examine whether the statutory scheme is 'so punitive either in purpose or effect as to negate . . . [that] intention' to deem it civil." *Id.* (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)). But we typically "defer to the legislature's stated intent," and "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (cleaned up). That is not this case.

28

First, in enacting 15 U.S.C. § 78u(d)(7), Congress clearly intended to provide a civil remedy. To determine whether a statutory scheme is civil or criminal, we "ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Hudson v. United States*, 522 U.S. 93, 99 (1997) (cleaned up). Disgorgement under § 78u(d) is designated as providing "[c]ivil money penalties," and we have previously characterized "disgorgement" as a civil remedy. 15 U.S.C. § 78u(d)(3); *see Contorinis*, 743 F.3d at 306 ("Disgorgement . . . is a civil remedy . . . preventing unjust enrichment.").

Second, Ahmed does not provide "the clearest proof" that disgorgement under § 78u(d)(7) is "so punitive either in purpose or effect" as to "transform what has been denominated a civil remedy into a criminal penalty." *Smith*, 538 U.S. at 92 (cleaned up). Ahmed argues that disgorgement is in practice a criminal penalty because its "'primary purpose . . . is to deter violations of the securities laws,' which is 'inherently punitive'" according to *Kokesh*. Appellant's Br. at 36 (quoting *Kokesh*, 137 S. Ct. at 1643). Ahmed also contends the NDAA is punitive because it has a longer limitations period for violations committed with scienter than for those without.

But Ahmed misreads *Kokesh*. In *Liu*, the Supreme Court recognized that *Kokesh* "expressly declined to pass on the question" of whether "disgorgement is *necessarily* a penalty, and thus not the kind of relief available at equity." *Liu*, 140 S. Ct. at 1946 (emphasis added). The disgorgement award in *Kokesh* was deemed a "penalty" because it "exceed[ed] the bounds of traditional equitable principles" in awarding disgorgement "as a consequence of violating public

29

laws" and to deter the wrongdoer, not to compensate victims. *Id.* at 1941, 1946. But *Kokesh* "ha[d] no bearing on the SEC's ability to conform future requests for a defendant's profits to the limits outlined in common-law cases awarding a wrongdoer's net gains." *Id.* at 1946. In other words, *Liu* approved disgorgement as long as the award conforms to traditional equitable limitations—*i.e.*, "restoring the status quo and ordering the return of that which rightfully belongs to the purchaser or tenant." *Tull v. United States*, 481 U.S. 412, 424 (1987) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 402 (1946)).

Moreover, the longer limitations period for violations committed with scienter does not render disgorgement punitive. The more plausible inference is a nonpunitive one—*i.e.*, scienter is an element of fraud, which may be harder to detect and investigate because fraud is usually committed with deception. *Cf. Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 644 (2010) ("[I]n the case of fraud, . . . a defendant's deceptive conduct may prevent a plaintiff from even *knowing* that he or she has been defrauded."). We thus hold that the district court's application of the NDAA did not violate the Ex Post Facto Clause.[10]

\* \* \*

In sum, we find no abuse of discretion in the district court's calculation of disgorgement or error in its application of the NDAA.

---

[10] Our decision to vacate and remand the actual-gains award, *see infra* Section II.C, does not bear on our Ex Post Facto Clause analysis. The district court did not increase the actual-gains award following the NDAA nor do Defendants raise a related Ex Post Facto Clause challenge.

C.    Calculation of Interest and Actual Gains

We affirm the district court's award of prejudgment interest but vacate and remand the award of "actual gains" because it is broader than equity permits.[11]

### 1.    *Legal Standard*

The district court's prejudgment-interest and actual-gains awards were incident to disgorgement, so we consider whether they "fall[] into those categories of relief that were *typically* available in equity."  *Liu*, 140 S. Ct. at 1942 (cleaned up).   One such category of relief is "supplemental enrichment," which encompasses the opportunity cost or time value of money lost by victims, including "interest, rent, and other measures of use value, proceeds, and consequential gains" on ill-gotten assets.   2 Restatement (Third) of Restitution and Unjust Enrichment ("Restatement") § 53(1) & cmt. a (Am. L. Inst. 2011); *see* 1 Dan B. Dobbs, Law of Remedies: Damages–Equity–Restitution § 3.6(2), at 342-43 (2d ed. 1993) ("When the defendant is under a duty to pay the plaintiff as damages or otherwise, and during the period of nonpayment the defendant has a legally recognized benefit from use of the money retained, he is under an obligation to make restitution of that benefit to the plaintiff, whether the benefit is measured in profits or interest or some other form of use value.").   Supplemental enrichment may thus reflect

---

[11] The parties disagree about the calculation of post-judgment interest.   In a December 2, 2022 order, the district court took a different approach from what either party argues here.   Ahmed appealed from this order, and the appeal was consolidated with other appeals from liquidation, all of which were held in abeyance pending this appeal.   As explained *infra*, those appeals are dismissed as moot.

passive gains on ill-gotten funds, without the direct manipulation of a fraudster.   We review a district court's "choice of remedies" for abuse of discretion.   *SEC v. Frohling*, 851 F.3d 132, 139 (2d Cir. 2016).

### 2. *Prejudgment Interest*

The district court did not abuse its discretion by awarding prejudgment interest at the IRS underpayment rate for the period before the asset freeze.   The Relief Defendants argue that prejudgment interest was inappropriate because they did not act wrongfully or know of Ahmed's wrongful actions and, even if appropriate, the IRS underpayment rate was punitive and thus contrary to traditional equitable principles.   The SEC counters that the Relief Defendants' alleged good faith is irrelevant to prejudgment interest on *Ahmed*'s disgorgement obligation.   Moreover, the Relief Defendants present no evidence that the IRS underpayment rate would overcompensate Ahmed's victims and thus be punitive.   We agree with the SEC.

"The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion, and will not be overturned on appeal absent an abuse of that discretion."   *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1071-72 (2d Cir. 1995) (cleaned up).   In assessing prejudgment-interest awards, a court should consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court."   *Wickham Contracting Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992).

The district court did not abuse its discretion by awarding prejudgment interest at the IRS underpayment rate. First, the good faith of the Relief Defendants is immaterial because a prejudgment award concerns the amount that Ahmed, the primary defendant, must disgorge. *Cf. Morales v. Freund*, 163 F.3d 763, 767 (2d Cir. 1999) (upholding the decision not to award prejudgment interest when the "district court suggested that the defendants, though liable, might well have acted in good faith"). *See generally CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010) ("A relief defendant is a person who holds the subject matter of the litigation in a subordinate or possessory capacity . . . [and] may be joined in a securities enforcement action to aid the recovery of relief." (cleaned up)). The district court found that Ahmed committed securities fraud, so there is no question that he lacked good faith. Even though, as explained *infra*, relief-defendant liability may be inappropriate as against a particular asset, that does not bear on the propriety or size of prejudgment interest against the primary defendant. *See SEC v. Miller*, 808 F.3d 623, 635 (2d Cir. 2015) ("Equitable relief against a third-party non-wrongdoer may be entered where such an individual (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." (cleaned up)).

Second, the district court did not abuse its discretion by awarding prejudgment interest at the IRS underpayment rate. That rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (affirming use of the IRS underpayment rate). This rate thus reflects "use value," or unearned interest that the rightful owner of the funds could have

33

received but for the fraud. In *First Jersey*, we squarely rejected the argument that the district court should have applied the one-year treasury-bill rate—*i.e.*, "the rate at which one lends money to the government rather than borrows money from it"—because "defendants have had the use of the money." *Id.* at 1476-77. Here, Ahmed held the ill-gotten gains before the asset freeze, so the IRS underpayment rate was appropriate.[12] We thus affirm the district court's award of prejudgment interest.

### 3. *Actual Gains*

We vacate and remand the district court's award of actual gains because it failed to account for traditional equitable limitations. The parties dispute the proper equity analog for actual gains. On one hand, the Relief Defendants argue that we should look to constructive trust, which requires that gains come from assets traceable to the fraud. On the other hand, the SEC argues that the proper equity analog is "accounting" or "accounting for profits," forms of restitution by money judgment.

Both constructive trust and accounting may be appropriate analogs for a primary disgorgement award, but neither is helpful here. Our review is limited to the scope of actual gains on disgorged assets—*i.e.*, "supplemental or collateral benefits derived by the recipient from an initial transaction with the claimant." 2

---

[12] The Relief Defendants have not put forth any evidence that the investment return from the Oak funds was less than the IRS underpayment rate. Their concerns about overcompensation are thus unfounded or, at the very least, premature before distribution. *See* 2 Restatement § 53(1) ("[Supplemental] [e]nrichment . . . may be presumed in the case of a recipient who is enriched by misconduct.").

Restatement § 53 cmt. a; *see* 1 Dobbs, Law of Remedies, *supra* at 31, § 4.5(3), at 637 ("[I]f a consequential benefit measure is justified, it need not be pursued under either a trust or an accounting theory.").

The most appropriate equity analog for the actual-gains award here appears to be "consequential gains." Consequential gains "result from a profitable investment, use, or other disposition of the [plaintiff's] property, distinct from the transaction by which the defendant was originally enriched." 2 Restatement § 53 cmt. d; *see also* 1 Dobbs, Law of Remedies, *supra* at 31, § 4.5(3), at 637 ("In the case of restitution, courts can take the measure of *consequential benefits*, not the value of the thing itself but the value it produces in the hands of defendant." (emphasis in original)).

One equitable limitation on consequential gains is that a "conscious wrongdoer" is liable for "consequential gains that are not unduly remote." 2 Restatement § 53(3). As the Restatement commentary suggests, "[t]he object of the disgorgement remedy—to eliminate the possibility of profit from conscious wrongdoing"—is measured by the "net increase in the assets of the wrongdoer, to the extent that this increase is *attributable* to the underlying wrong." *Id.* § 51 cmt. e (emphasis added). And treatises confirm:

> Even the willful wrongdoer should not be made to give up that which is his own; the principle is disgorgement, not plunder. . . . [S]ome apportionment must be made between those profits attributable to the plaintiff's property and those earned by the defendant's efforts and investment, limiting the plaintiff to the profits *fairly attributable to his share*.

35

1 Dobbs, Law of Remedies, *supra* at 31, § 4.5(3), at 642 (emphasis added).   So consequential gains on assets subject to disgorgement must not be unduly remote from the fraud.[13]

Here, the district court did not consider whether consequential gains on frozen assets were unduly remote from Ahmed's fraud.   Its September 6, 2018 ruling simply awarded "actual returns on the frozen assets" without elaboration or limitation based on Ahmed's profitable uses of the frozen assets.   Special App'x at SPA-106.[14] And its December 14, 2018 ruling, which sought to clarify the

---

[13] The Restatement provides "scant guidance on how to determine wealth legally attributable to a wrong for purposes of disgorgement" and remoteness.   Mark P. Gergen, *Causation in Disgorgement*, 92 B.U. L. Rev. 827, 827 (2012); *see also* George E. Palmer, Law of Restitution § 2.13 (3d ed. 2023) (noting a "recurring problem[] in the law of restitution" is calculating "the defendant's gain [that] is the product not solely of the plaintiff's interest but also of contributions made by the defendant").   But several factors may guide courts awarding consequential gains, including "general considerations of fairness, . . . the nature of the defendant's wrong, the relative extent of his contribution, and the feasibility of separating [gains] from the contribution traceable to the plaintiff's interest."   Palmer, Law of Restitution, *supra*, § 2.13; *see* 1 Dobbs, Law of Remedies, *supra* at 31, § 4.5(3), at 646 (providing factors governing "[r]ecovery of the defendant's consequential gains").

[14] District courts have discretion in awarding supplemental enrichment, which could include "actual returns on the frozen assets." Special App'x at SPA-106.   We have previously limited the availability of prejudgment interest during the period of an asset freeze when the defendant has "been denied the use of those assets."   *SEC v. Razmilovic*, 738 F.3d 14, 36 (2d Cir. 2013).   But it may be appropriate for a district court to award an alternative measure of supplemental enrichment, such as a fixed interest rate that approximates "fair compensation to the person wronged" within the equitable limits set forth in *Liu*.   140 S. Ct. at 1943.

previous ruling, again imposed no limitation on actual gains and instead ordered disgorgement of "any actual interest accrued or gains earned on the frozen assets used to satisfy that disgorgement amount." *Id.* at SPA-151. Indeed, at oral argument, the SEC conceded that these 2018 orders failed to address any equitable limitation on actual gains. Moreover, the district court's September 4, 2019 ruling on Ahmed's motion to alter the judgment merely clarified that (1) "interest or gains are owed only on the frozen assets used to satisfy the disgorgement amount"; and (2) "interest or gains should be calculated by determining the actual interest accrued or gains earned and not by using the checking account interest rate." *Id.* at SPA-207 (cleaned up). After this Court remanded for the district court to recalculate Ahmed's disgorgement obligation under the NDAA, the district court stated it would award "any interest or gains accrued on disgorged frozen assets from the date of the [district court's] freeze order," again without restriction. *Id.* at SPA-251. The district court should have ensured that consequential gains on frozen assets were not unduly remote from Ahmed's wrongdoing or, in other words, were attributable to the fraud.

We disagree with the SEC's argument that the district court's award of actual gains is authorized by *SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013). In *Razmilovic*, we held that prejudgment interest was inappropriate during the period of an asset freeze because "the defendant has already, for that period, been denied the use of those assets." *Id.* at 36. In passing, we also noted, "[i]n such a case, after a final order of disgorgement, the funds previously frozen would presumably be turned over to the government in complete or partial satisfaction of the disgorgement order, along with any interest that has accrued on them during the freeze period." *Id.* We do not read

*Razmilovic* to give the district court blanket permission to award actual gains without limitations. Rather, under *Liu*, any such award must be consistent with equity, and the use of the word "presumably" in *Razmilovic* suggests that its discussion of supplemental enrichment (*i.e.*, "interest that has accrued") was *dicta*. *Id.*

The Relief Defendants argue that our decision in *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972), bars the award of actual gains. This, too, is inapposite. The district court in *Manor Nursing* ordered disgorgement of "proceeds received in connection" with the defendants' fraud and "profits and income earned on such proceeds." *Id.* at 1104 (emphasis omitted). We affirmed disgorgement of "proceeds" as "a proper exercise of the district court's equity powers" but vacated the district court's award "of profits and income earned on the proceeds" as "a penalty assessment." *Id.* We reasoned that an award of "profits" would "arbitrarily requir[e] those [defendants] who invested wisely to refund substantially more than other [defendants]." *Id.* at 1104-05. The "only plausible justification" for disgorgement of "profits and income" was "the deterrent force," but we found the district court's orders of injunctive relief and disgorgement of "proceeds" were "sufficient deterrence to further violations" of the federal securities laws. *Id.* at 1104. Instead of "profits and income," we ordered "interest [on the proceeds] at the New York legal rate from the date [defendants] received the proceeds." *Id.* at 1105.

But any suggestion in *Manor Nursing* that consequential gains are generally impermissible is in tension with *Liu*. Under *Liu*, if supplemental enrichment is consistent with traditional principles of equity, it is not a "penalty." Supplemental enrichment is governed

38

by restitutionary principles—*i.e.*, "restor[ing] the status quo," *Liu*, 140 S. Ct. at 1943 (internal quotation marks omitted)—not deterrence of "further violations" of the securities laws, *Manor Nursing*, 458 F.2d at 1104.   Moreover, district courts retain broad discretion as to the appropriate measure of supplemental enrichment, whether it is a form of profits or interest.   *See, e.g.*, 1 Dobbs, Law of Remedies, *supra* at 31, § 3.6(2), at 343 ("The profits of the fiduciary in this [disgorgement] example represent one measure of use value of the money.   It is capable of earning interest and it is capable of earning profits.   In this kind of case the plaintiff is entitled to the profits measure if he prefers.").

We thus remand for the district court to reassess actual gains in light of *Liu*.   On remand, the district court retains discretion over the appropriate measure of supplemental enrichment.   *Liu* offers general guideposts for equitable relief: namely, wrongdoers should (1) be deprived of their net profits from unlawful activity; and (2) "not be punished by paying more than a fair compensation to the person wronged."   140 S. Ct. at 1942-43 (cleaned up).   If the district court reimposes an actual-gains award on disgorged assets, it should ensure that consequential gains on the frozen assets are not "unduly remote."   *See supra* note 13.   The district court may also elect a different measure of supplemental enrichment consistent with "fair compensation," such as a fixed-interest rate for the period of the asset freeze.[15]

---

[15] The parties dispute the district court's method of calculating actual gains, but we decline to reach this issue given our vacatur of the actual-gains award.

D.    Nominee Doctrine

Finally, the district court's analysis in support of its conclusion that the Relief Defendants are merely nominal owners of all the frozen assets held in their names was inadequate.   The Relief Defendants argue that the district court should have applied an asset-by-asset approach to the nominee theory and the SEC failed to satisfy its burden of proving that the Relief Defendants were mere nominees of Ahmed as to each asset when they held legal title to, controlled, and received benefits from those assets.   The SEC argues that the district court correctly characterized the "nominee" doctrine, did not shift the burden of persuasion to the Relief Defendants, and could not have applied an asset-by-asset approach because the Relief Defendants failed to meet their burden to produce evidence of their legitimate ownership of each of the disputed assets.   Furthermore, if the Court remands, the SEC seeks permission to pursue alternative theories of recovery, including under *Cavanagh I*, 155 F.3d 129.

1.    *Legal Standard*

Equitable limits on disgorgement differ between assets held by the primary wrongdoer (*i.e.*, Ahmed) and those held by third-party non-wrongdoers (*i.e.*, Relief Defendants).   *See Miller*, 808 F.3d at 635. As to primary defendants, "[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation."   *Razmilovic*, 738 F.3d at 31 (cleaned up). District courts need not "apply equitable tracing rules to identify specific funds in the defendant's possession that are subject to return."   *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011); *see, e.g., Contorinis*, 743 F.3d at 303 (explaining, in the context of an insider-trading violation, "the insider would unquestionably be

liable to disgorge the profit . . . whether the insider trader has put his profits into a bank account, dissipated them on transient pleasures, or given them away to others"). So the district court is not required to "trace" ill-gotten gains to specific assets in Ahmed's possession—any of his own assets may be liquidated to satisfy his disgorgement obligation.[16]

For relief defendants, however, equity imposes different rules. "A court of equity will wrest property fraudulently acquired, not only from the perpetrator of the fraud, but . . . from his children and his children's children, or, as elsewhere said, from any persons amongst whom he may have parceled out the fruits of his fraud." 3 John Norton Pomeroy, Equity Jurisprudence § 918, at 601 (5th ed. 1994) (cleaned up). But third parties, like the Relief Defendants, have a bona fide purchase defense according to which "[a] purchaser for value and without notice acquires the legal interest that the grantor holds and purports to convey, free of equitable interests that a restitution claimant might have asserted against the property in the hands of the grantor." 2 Restatement § 66; *see also id.* § 58(2) ("A claimant entitled to restitution from property or its traceable product may assert the same rights against any subsequent transferee who is not a bona fide purchaser . . . or bona fide payee."). A bona fide purchase defense is inherently asset specific, requiring a court to determine whether a third party (1) gave value in exchange for an asset in particular and (2) lacked notice as to that asset's true provenance.

---

[16] Since *Liu*, this Court has affirmed the lack of a tracing requirement as to primary-defendant disgorgement. *See, e.g.*, *SEC v. de Maison*, No. 18-2564, 2021 WL 5936385, at *2 (2d Cir. Dec. 16, 2021).

In *Cavanagh I*, we recognized third-party liability in a securities-enforcement action when a relief defendant "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." 155 F.3d at 136. Although *Cavanagh I* was decided in the asset-freeze context, it is based on the same background principles of equity, including the bona fide purchase rule. *See* Palmer, Law of Restitution, *supra* at 36 n.13, § 19.7 ("Courts are generally agreed that an innocent person who obtains a benefit through the wrongful act of a third person will be required to make restitution to the one at whose expense the benefit was obtained, unless, in addition to his innocence, the recipient is protected because he gave value."). So relief-defendant liability under *Cavanagh I* applies to disgorgement.[17]

But equity also recognizes a third way: the so-called "nominee" theory. A "nominee" holds bare legal title to an asset but is not its true equitable owner. Such an asset may be disgorged to satisfy a judgment against a third party deemed to be the asset's true equitable owner.[18] This doctrine reflects the principle that "equity looks to the intent, rather than to the form," and is thus "able to treat that as done which in good conscience ought to be done." 2 Pomeroy, Equity Jurisprudence, *supra* at 41, §§ 363, 378, at 8, 41

---

[17] Several sister circuits also have continued to recognize relief-defendant liability after *Liu*. *See, e.g.*, *SEC v. Berkeley Healthcare Dynamics, LLC*, No. 20-16754, 2022 WL 42807, at *2 (9th Cir. Jan. 5, 2022); *SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at *13-17 (10th Cir. Dec. 16, 2021).

[18] Relief Defendants argue that state law governs the "nominee" doctrine. We disagree. Federal courts are courts of law and equity, *see* U.S. Const. art. III, § 2, cl. 1, and to deduce equitable limits, we may look to the practices of the state and federal courts and "the ordinary principles and practice of courts of chancery." *Liu*, 140 S. Ct. at 1950 (cleaned up).

(emphasis omitted). "Equity's advantage in fashioning restitutionary remedies was . . . sidestepping title problems . . . . to act against the person rather than against the property." 1 Dobbs, Law of Remedies, *supra* at 31, § 4.3(1), at 587. The principle undergirding the nominee theory has been widely applied. *See, e.g.*, *Nat'l Bank v. Case*, 99 U.S. 628, 632 (1878) ("A transfer for the mere purpose of avoiding his liability to the company or its creditors is fraudulent and void, and he remains still liable. . . . [I]f, in fact, the transferee is a mere tool or nominee of the transferrer, so that, as between themselves, there has been no real transfer, . . . the transfer will be held for nought." (cleaned up)); *Higgins v. Smith*, 308 U.S. 473, 475 (1940) ("[T]he jury was instructed to find whether these sales by the taxpayer . . . were actual transfers of property . . . or whether they were to be regarded as simply 'a transfer by Mr. Smith's left hand, being his individual hand, into his right hand, being his corporate hand, so that in truth and fact there was no transfer at all.'"). We thus agree with the district court that the nominee theory, as a reflection of background equitable principles, may be used to determine the owner of an asset for disgorgement purposes. If a relief defendant is deemed a mere nominal owner of an asset that is equitably owned by the primary defendant, the equitable rules governing primary-defendant disgorgement apply. Like the bona fide purchase defense, the nominee doctrine is necessarily an asset-specific inquiry. The inquiry turns on a third party's behavior toward a *particular* asset, such as whether the third party controlled, benefitted from, and/or transferred a particular asset held in a nominee's name. We review a district court's exercise of equitable

power to fashion a disgorgement remedy for abuse of discretion. *Frohling*, 851 F.3d at 139.

2.    *Application*

The district court's application of the nominee doctrine was inadequate as to most of the assets in question because it failed to determine whether the SEC proved that these particular assets (or groups of similar assets) were held by the Relief Defendants as mere nominees of Ahmed.    The district court invoked a six-factor nominee test but did not apply it on an asset-by-asset basis.    Instead, it deemed the Relief Defendants nominal owners of a large swathe of assets without finding that Ahmed is in fact the equitable owner. This erroneously shifted the burden to the Relief Defendants to show that Ahmed is *not* the equitable owner of assets to which the Relief Defendants hold legal title.[19]    *See* Dan B. Dobbs & Caprice L. Roberts, Law of Remedies: Damages–Equity–Restitution § 4.4(3), at 446 (3d ed. 2018) ("The law of unjust enrichment places the burden of production on the party seeking disgorgement.").

Specifically, the district court's analysis regarding the Iftikar A. Ahmed Family Trust, MetLife Policy (which was owned by the Iftikar A. Ahmed Family Trust), and Fidelity x7540 account was sufficient because the district court weighed the SEC's evidence and considered the Relief Defendants' counter-evidence as to each asset and made

---

[19] We note, however, that relief defendants carry the burden of proof with respect to affirmative defenses such as bona fide purchase.    *See CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 n.5 (4th Cir. 2002).    We also note that courts in civil cases can draw adverse inferences against relief defendants should they invoke their Fifth Amendment privilege not to testify.    *See SEC v. Colello*, 139 F.3d 674, 677-78 (9th Cir. 1998).

findings on the record. But as to other assets, the district court's analysis was insufficient. For many of the disputed assets, the district court simply rejected the Relief Defendants' request for an asset-by-asset approach by noting that the Relief Defendants "made this same argument before the Second Circuit and it was soundly rejected." Special App'x at SPA-110 (citing *I-Cubed*, 664 F. App'x at 56-57). But *I-Cubed* concerned the asset freeze, which required "a lesser showing than is necessary for other forms of equitable relief," like disgorgement. *I-Cubed*, 664 F. App'x at 55. Moreover, for certain assets, such as the contents of the safety deposit box and the Ahmeds' two Park Avenue apartments, the district court made findings only at the preliminary-injunction stage. And the district court was silent as to other assets, such as Shalini Ahmed's earrings and designer handbags, but it nevertheless authorized disgorgement of those assets.

As a result, the district court erroneously shifted the burden to the Relief Defendants to present evidence that they were the true owners of these assets. But the burden remained with the SEC to prove that Ahmed was the true owner of each asset (or group of similar assets), and the district court should have made specific findings accordingly. Furthermore, the district court discussed Ahmed's invocation of his Fifth Amendment right against self-incrimination and Shalini Ahmed's invocation of her marital privilege but failed to discuss what, if any, adverse inference should be drawn.

So, with the exception of the district court's findings that Ahmed is the equitable owner of the Iftikar A. Ahmed Family Trust, MetLife Policy, and Fidelity x7540 account, we vacate and remand the district court's disgorgement order as to the Relief Defendants' assets.

45

On remand, the SEC, as the party seeking disgorgement, must prove that the Relief Defendants are nominees for each asset or class of assets.[20]  If the district court finds that an asset is nominally owned by one of the Relief Defendants (and actually owned by Ahmed), it may be disgorged.  If the district court finds that an asset is not nominally owned by one of the Relief Defendants, then the district court may consider whether an alternative theory of relief-defendant liability permits disgorgement of the asset.  For example, the district court may apply *Cavanagh I* liability or a joint-ownership theory.[21] Moreover, consistent with the burden of proof, the district court should state on the record what, if any, adverse inferences it draws from the Relief Defendants' failure to testify if the SEC offers that evidence.

## III.  CONCLUSION

We conclude that the district court (1) reasonably excluded Ahmed from parts of discovery and denied him access to frozen funds to hire counsel; (2) accurately calculated disgorgement by approximating the "net profits" of Ahmed's fraud; and (3) properly gave retroactive effect to the NDAA's disgorgement amendments. But applying traditional principles of equity under *Liu*, we also conclude that (4) the district court's award of actual gains exceeded equitable limitations by failing to ensure that no unduly remote

---

[20] We agree with the Relief Defendants' suggestion at argument that "in some cases assets can be grouped if the same analysis applies to multiple assets" or "[c]lasses of assets."  Oral Arg. Tr. at 12-13.

[21] The parties dispute whether the district court's joint-ownership analysis was *dicta* or an alternative holding.  The record is unclear, and the district court is best positioned to clarify on remand.

consequential gains are awarded; and (5) the "nominee" doctrine—though well-established in equity and applicable to disgorgement—must be applied on an asset-by-asset basis. For the foregoing reasons, we affirm in part and vacate and remand in part the district court's judgment.

Our vacatur of the actual-gains award and application of the nominee doctrine affects the scope of the district court's liquidation orders. In a separate order, we thus *sua sponte* dismiss as moot Defendants' appeals from those orders, 22-135, 22-184, 22-3077, 22-3148. We also deny as moot Relief Defendants' motions for a stay of liquidation, and all stays are vacated.